SCOTT YOUNG (10695)
**SPENCER FANE LLP**
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-9000
rsyoung@spencerfane.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| SHELDON DAVID NORCROSS, TYLER MATTHEW SHAW, SIERRA NICOLE LAUTS, and STEVEN ALLEN,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF AMERICAN FORK;<br>OFFICER COLE G. RICHARDSON;<br>LIEUTENANT Q. ADAMSON;<br>OFFICER S. HAWKINS;<br>OFFICER K. FRAUGHTON;<br>OFFICER R.J. BIBEAU;<br>OFFICER L. SUMBOT;<br>OFFICER J. SOMERVILLE;<br>OFFICER SPENCER TONGA;<br>OFFICER J. LAYCOCK;<br>OFFICER D. GONZALEZ;<br>OFFICER JENSEN;<br>SERGEANT LOTT; and<br>DETECTIVE W. NICOSIA, all in their individual capacities,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.<br><br>Judge: |

**<u>COMPLAINT AND JURY DEMAND</u>**

Plaintiffs Sheldon David Norcross, Tyler Matthew Shaw, Sierra Nicole Lauts, and Steven Allen, through counsel, complain against Defendants as follows:

## INTRODUCTION

1. This is a civil rights action under 42 U.S.C. § 1983 arising from four days in March 2026 during which officers of the American Fork Police Dept. ("AFPD") detained, searched, handcuffed, arrested, and interrogated Plaintiffs, none of whom was ever charged with any crime, since none was committed.

2. Plaintiffs were helping an investigative journalist and YouTuber, Benjamin Schneider, document and pursue a civil dispute over an Oregon family's LEGO collection. Plaintiffs tried to serve court papers, drove a car, filmed, raised money on GoFundMe, and hung a sign on a neighbor's fence with the neighbor's permission. That is lawful, constitutionally protected activity.

3. In response, AFPD officers stopped Plaintiff Tyler Shaw for a stop-sign violation that AFPD's own Chief of Police now admits never happened; held Mr. Shaw for roughly two hours, ran him through field sobriety tests, and brought a drug dog to his car after he blew a .000 on a breath test, while the officer in charge, explained: "I was gonna scare him a little bit and let him go"; ripped Plaintiff Sheldon Norcross's phone from his hand and arrested him because, in the officer's own words, Mr. Norcross invoked his right to remain silent; and then obtained a search warrant for "stolen . . . Lego merchandise" on a sworn affidavit that the Chief now calls "one of the biggest places where we screwed up," and used it to storm a basement rental with guns drawn including a rifle, handcuff every occupant—including a 16-year-old—and haul them all to the police station.

4. The Chief of Police, Cameron Paul, initially defended all of this in a 26-minute YouTube video. After an outside review, he conceded in a recorded meeting that "we didn't do this perfectly," that "several issues . . . weren't handled well, or were handled outside of policy,"

that "it was clearly not a stop sign violation," that the reasons written for seizing Mr. Norcross's phone "would not be a justification for seizing the phone," that "[t]his didn't really have anything to do with Legos. We weren't going in to look for Legos. We didn't even search the residence for Legos," that the affidavit "did not get reviewed by a supervisor" despite "a clear directive and policy" requiring it, and that what the officers "would have needed to have . . . is individualized, probable cause for all five individuals."

5. Those admissions confirm what the body-worn camera footage, dash camera footage, and AFPD's own reports show: the individual Defendants violated Plaintiffs' clearly established First and Fourth Amendment rights, and they did so because the City of American Fork staffed its patrol division with inexperienced officers, failed to train them on the constitutional limits that govern traffic stops, phone seizures, warrant affidavits, and warrant execution, and failed to enforce even the safeguards its own written policies require.

## PARTIES

6. Plaintiff Sheldon David Norcross is an adult who resides in Illinois.

7. Plaintiff Tyler Matthew Shaw is an adult who resides in American Fork, Utah. He was 23 years old at the time of the events described below and had never been in trouble with law enforcement.

8. Plaintiff Sierra Nicole Lauts is an adult who resides in Utah. At all relevant times she was over eighteen years old, a legal resident of the United States, and not a party to the case in which she served process, and she was therefore qualified to serve process in Utah.

9. Plaintiff Steven Allen is an adult who resides in Saratoga Springs, Utah.

10. Defendant City of American Fork (the "City") is a municipal corporation organized under the laws of the State of Utah. The City operates, funds, and controls the American Fork

Police Department and is responsible for its policies, customs, practices, hiring, training, supervision, and discipline. Chief of Police Cameron Paul is the City's final policymaker with respect to AFPD's law-enforcement policies, training, supervision, and discipline.

11. Defendant Officer Cole G. Richardson was at all relevant times a sworn AFPD patrol officer. He initiated the March 8, 2026 stop of Mr. Shaw, seized Mr. Norcross's phone and arrested him on March 11, 2026, swore out the search warrant affidavit at issue, created the operations plan for the warrant service, and held "lethal coverage" with his patrol rifle during the entry.

12. Defendant Lieutenant Quinn Adamson was at all relevant times a sworn AFPD lieutenant and supervisor. He participated in the seizure of Mr. Norcross's phone and in his arrest, cut down and seized the GoFundMe sign, threatened Mr. Allen with arrest, surveilled the Airbnb and, upon information and belief, conducted the homeowner contact upon which the warrant affidavit relied, and was present at and participated in the March 11, 2026 warrant execution/raid.

13. Defendant Officer R.J. Bibeau was at all relevant times a sworn AFPD officer. On March 9, 2026, he stood guard over Mr. Shaw at the curb while Mr. Shaw's car was sniffed by the dog and searched.

14. Defendant Officer S. Hawkins was at all relevant times a sworn AFPD patrol officer and the primary officer on the March 9, 2026 stop of Mr. Shaw.

15. Defendant Officer K. Fraughton was at all relevant times a sworn AFPD officer and the handler of police canine "Bane." He participated in the March 9, 2026 stop, the canine sniff, and the search of Mr. Shaw's vehicle.

16. Defendant Officer L. Sumbot was at all relevant times a sworn AFPD officer and the primary officer on the March 10, 2026 incident with Ms. Lauts.

17. Defendant Officer J. Somerville was at all relevant times a sworn AFPD officer. On March 10, 2026, he was posted at Ms. Lauts's car for the duration of the detention, by his own description so that the occupants would not "take off," and he was present when Ms. Lauts was told she was "trespassed" from property that she had never entered.

18. Defendant Officer Spencer Tonga was at all relevant times a sworn AFPD officer. He participated in the March 8, 2026 detention of Mr. Shaw and, on March 11, 2026, was third in the entry "stack," called the occupants out of the residence, and placed them in handcuffs.

19. Defendant Officer J. Laycock was at all relevant times a sworn AFPD officer. On March 11, 2026, he ran "the point position on a tactical stick," leading the entry team to and through the basement door.

20. Defendant Officer D. Gonzalez was at all relevant times a sworn AFPD officer. On March 11, 2026, he was on the entry team, was at the open doorway as the occupants were ordered out, took custody of at least one handcuffed occupant at Lieutenant Adamson's direction, handled the occupants' property, and placed at least one occupant in a patrol car for transport.

21. Defendant Officer *First Name Unknown* Jensen was at all relevant times a sworn AFPD officer. On March 11, 2026, he was on the entry team; handcuffed and searched Ms. Lauts and her bag; told Ms. Lauts, when she said she might need her inhaler, to tell him if she did; searched Mr. Shaw and took his phone, identification, and backpack; and transported two handcuffed male occupants to the station's holding cells.

22. Defendant Sergeant *First Name Unknown* Lott was at all relevant times a sworn AFPD sergeant and the ranking supervisor on the entry team for the March 11, 2026 warrant service. He was at the door as the occupants were ordered out, searched at least one handcuffed

occupant, took custody of Ms. Lauts's bag, and escorted Ms. Lauts, handcuffed, to a patrol car and buckled her in for transport to the station, telling the occupants that "some of you may get to jail."

23. Defendant Detective W. Nicosia was at all relevant times a sworn AFPD detective who, on March 11, 2026, continued the custodial detention of each Plaintiff at the police station and unconstitutionally interrogated each of them.

24. Each individual Defendant is sued in his individual capacity. At all relevant times, each individual Defendant acted under color of state law and within the course and scope of his employment with the City.

25. The individual Defendants acted intentionally, knowingly, maliciously, and with reckless and callous indifference to Plaintiffs' federally protected rights, entitling Plaintiffs to punitive damages against each of them.

## JURISDICTION AND VENUE

26. This action arises under the First and Fourth Amendments to the United States Constitution, as applied to the States through the Fourteenth Amendment, and under 42 U.S.C. §§ 1983 and 1988. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331.

27. Venue is proper in the District of Utah, Central Division, under 28 U.S.C. § 1391(b) because all Defendants reside in this District and all the events giving rise to this action occurred in American Fork, Utah County, Utah.

## FACTUAL ALLEGATIONS

### A. The evidence on which these allegations rest

28. The herein facts are drawn from Plaintiffs' own knowledge and from AFPD's own records, including its incident reports in Case Nos. 26AF01974, 26AF02007, 26AF02033, and 26AF02066; the search warrant affidavit, warrant, and return in Search Warrant No. 3352981; AFPD's "Law Enforcement Transparency Incident Entry"; and AFPD body-worn camera

("BWC") and in-car ("dash") camera footage. AFPD itself published these materials to the public through a link in a May 29, 2026 YouTube video titled "Bricks and Minifigs/Benjamin Schneider Media Release," in which Chief Paul narrated the department's account of these events.

29. According to Chief Paul, an AFPD evidence technician later placed the unredacted versions of the footage into that same public folder, which he called "a complete mistake." Chief Paul has stated that every video AFPD possesses from these incidents was released, so that "if something hasn't been released, then it means [it] just does not exist."

30. Some facts also come from two recorded meetings: an Aug. 10, 2026, meeting between Daniel Sroka, Mayor Brad Frost, and Chief Paul, and a September 16, 2026, meeting between Mr. Sroka and Chief Paul in which Chief Paul described the findings of his review of these incidents.

**B. Background: a journalist, an Oregon judgment, and lawful civil process**

31. Benjamin Schneider is an investigative journalist who publishes on YouTube under the name "Reckless Ben." In 2026 he investigated the claim of an Oregon man, Bryan, and Bryan's elderly, dying father, that a Bricks & Minifigs store in Keizer, Oregon had kept their consigned collection of roughly 780 LEGO Star Wars sets and more than 1,200 minifigures without paying for them.

32. Mr. Schneider and others obtained a judgment in Oregon against the store's operators. When the store closed rather than pay, they filed a new action in Oregon (Marion County Circuit Court Case No. 26SC06134) against an individual associated with the store, Joshua Johnson, who lives in American Fork, Utah. That action required personal service on Mr. Johnson in Utah.

33. Plaintiffs are four young adults who learned of the story and offered to help.

34. None of the Plaintiffs has ever been charged with any crime arising out of any of the events described in this Complaint.

### C. March 8, 2026 — Officer Richardson stops Mr. Shaw for a stop-sign violation that did not occur

35. On March 8, 2026, at approximately 12:50 p.m., Mr. Shaw was driving his 2022 Hyundai Elantra in American Fork with Mr. Schneider as his passenger.

36. Officer Richardson had just arrived at Mr. Johnson's residence on a call regarding a package delivered to Mr. Johnson. In his own words, he "flipped [his] patrol vehicle around to try and follow the suspect and hopefully gather a license plate."

37. Officer Richardson then stopped Mr. Shaw's car, claiming he "observed the vehicle fail to stop before the stop line at a stop sign, as well as failure to come to a complete stop."

38. That was false. Mr. Shaw stopped properly at the stop sign. There was no traffic violation and no other lawful basis to stop the car.

39. AFPD's Chief of Police agrees. After reviewing the footage, Chief Paul stated of Officer Richardson: "I understand that he thought he knew what the statute said, but he didn't"; "It's hard to justify any type of a stop sign violation here"; "I do not believe there was a stop sign violation"; and "he clearly misremembered, and it was clearly not a stop sign violation." Chief Paul further stated that AFPD has "since gone over the statute with him."

40. Chief Paul contends that Officer Richardson had reasonable suspicion for some other reason, which Plaintiffs deny, but he acknowledged that Officer Richardson "should have based his stop on that reasonable suspicion to begin with and not try to have drummed up some kind of other offense." The only basis Officer Richardson ever gave for the stop was a traffic violation that did not occur.

41. Once he stopped the car, Officer Richardson did not pursue any traffic matter. He took Mr. Shaw's license and immediately turned his attention to the back-seat passenger and whether he was Benjamin Schneider. Officer Richardson then held Mr. Shaw and his car on the roadside while Officer Tonga drove to the stop to conduct his own investigation of the package delivery.

42. Officer Tonga questioned Mr. Shaw and Mr. Schneider about the package delivery, then "notified" them that they were "trespassed" from Mr. Johnson's property and released them.

43. Mr. Shaw was detained for approximately fifteen to twenty minutes. He was not cited. Officer Richardson wrote that he "took no action on the traffic offenses."

### D. March 9, 2026 — Officers Hawkins and Fraughton hold Mr. Shaw for two hours to "scare him a little bit"

44. On the evening of March 9, 2026, Mr. Shaw was again driving his car with Mr. Schneider as a passenger. Mr. Shaw stopped to pick up an acquaintance, Christian Morgan, who had been dropped off near Mr. Johnson's residence.

45. Officer Hawkins had just told Mr. Morgan he was "trespassed" from Mr. Johnson's property. Mr. Morgan had left the property as instructed. Officer Hawkins then saw Mr. Morgan "attempt to get into" Mr. Shaw's car, activated his emergency lights, and stopped Mr. Shaw's car.

46. Officer Hawkins did not tell Mr. Shaw why he was stopped, there being no lawful reason for the stop. Walking toward a car after leaving a property when told to leave is not a crime, and Mr. Shaw had committed no traffic violation.

47. Officer Hawkins opened by demanding: "I'll ask again because I wasn't born yesterday. Why are we harassing people?"

48. Instead of addressing any traffic matter, Officer Hawkins accused Mr. Shaw and Mr. Schneider of "harass[ing]" Mr. Johnson. He then had Officer Fraughton look at Mr. Shaw's

eyes, and the two officers claimed that Mr. Shaw's eyes "were glossy and seemed to have a red layer of tint in them."

49. That claim was false, and the officers knew it was false. Officer Hawkins' in-car camera recorded him explaining the stop to another officer in his patrol car before the sobriety tests began. He said he had stopped the car because "I watch them try to get in this car," and that "[t]he main reason was I smelled alcohol on the other guy's breath. So I was hoping he just got caught." Asked whether "these guys" were good "to drive," the answer recorded was: "Yeah, I think so. I didn't see anything clear as day with Tyler that I noticed."

50. Officer Hawkins then described his plan in his own words: "I was gonna scare him a little bit and let him go." When the other officer asked, "do we have . . . charges or are we just tired of them being annoying?", Officer Hawkins answered that he would "try to link it to" Mr. Schneider: "So if I can get Ben to say, yeah, well, I did tell him to go over there and do that, then I have harassment charges on [him]. . . . I don't care that much, it's more of just the fact that they're trying to be sneaky." He added, "we don't really have a harassment code in Utah."

51. Officer Hawkins therefore knew, before he ever removed Mr. Shaw from the car, that he had no reasonable suspicion that Mr. Shaw was impaired or had committed any crime. He prolonged the stop anyway: to "scare him a little bit," and to try to build a case against Mr. Schneider.

52. Scaring someone is not a lawful basis to stop him or to prolong a stop.

53. Officer Hawkins told Mr. Morgan, whom he was trespassing from the property: "[T]his isn't Salt Lake County, this is Utah County. [We do] things differently down here. So if I wanted to, I could push things."

54. At the point he began the sobriety investigation, Officer Hawkins muted his body-worn camera. His camera records no audio for roughly forty-seven minutes, from about 8:52 to about 56:26 of the recording. His own report admits: "From this portion on in my investigation I did not realize my body cam was muted. Therefore there will be no sound from this moment on."

> From this portion on in my investigation I did not realize my body cam was muted. Therefore there will be no sound from this moment on.
>
> Officer Fraughton stated that he believed Tyler's eyes were glossy as well and seemed to provide the same tint I saw. Therefore I made contact with Tyler and told him that I would like him to conduct Field Sobriety tests to make sure he was safe to drive. Tyler Consented.

**Figure 1:** *Officer Hawkins' Supplemental Narrative, Incident Report 26AF02007, p. 7.*

55. Officer Hawkins then removed Mr. Shaw from his car, sat him on the sidewalk, and administered standardized field sobriety tests. By Officer Hawkins' own account, Mr. Shaw showed no clues on the eye test and no clues on the third test. Officer Hawkins claimed three "clues" on the walk-and-turn because Mr. Shaw raised his arms once and made an "improper turn" — even though Mr. Shaw had told him that he had a bad ankle.

56. Officer Hawkins' report on the sobriety tests twice refers to the subject of the testing as "Johnny," a person who was not present, indicating that the narrative was likely copied from another report rather than written from what Officer Hawkins observed of Mr. Shaw.

57. Officer Hawkins then had Mr. Shaw blow into a portable breath tester. Mr. Shaw blew ".000 BrAc." Any suspicion of impairment was thus dispelled.

> Due to my findings I told Tyler that I had more investigating to do. And I requested that Tyler do a portable breath test. He consented and blew a .000 BrAc.

**Figure 2:** *Incident Report 26AF02007, p. 7.*

58. At that moment, whatever the original mission of the stop had been was complete. The officers were required to release Mr. Shaw. Instead, Officer Hawkins ordered Mr. Shaw to "wait on by the curb" and called for Officer Fraughton's drug-detection dog.

```
I told Tyler that as of this moment, I wanted him to wait on by the curb while I
spoke with Ben.

K9:

I requested the assistance of Officer Fraughton's K9 Bane.

He conducted an open air sniff around the vehicle and alerted to the vehicle.
```

**Figure 3:** *Incident Report 26AF02007, p. 8.*

59. Officer Fraughton deployed canine Bane for an "open air sniff" around Mr. Shaw's car. The officers falsely claimed that the dog "alerted" to justify an unlawful search that they had already decided to conduct.

60. Officer Hawkins announced to the occupants that "as of this moment, the police K9 alerted and the vehicle is going to be searched." Mr. Shaw, a frightened 23-year-old who had never been in trouble with the police, did not resist. Any "consent" Mr. Shaw expressed was mere acquiescence to a search the officers had already announced would occur, and it was the product of an unlawfully prolonged detention.

61. While the dog was deployed and the car searched, Officer Bibeau kept Mr. Shaw at the curb, telling him to "just stay . . . and be cooperative." Officer Bibeau acknowledged to Mr. Shaw that the officers' suspicion concerned someone else: "Sounds like that other guy you are with has been drinking. . . . I haven't talked to him, but that's what they're thinking."

62. Officers Hawkins and Fraughton searched Mr. Shaw's car. In Officer Hawkins' words, "nothing of note or substance was located in the vehicle."

```
see the issue with that. I told Ben that as of this moment, the police K9
alerted and the vehicle is going to be searched.

SEARCH:

The search was conducted by Officer Fraughton and I, but nothing of note or
substance was located in the vehicle.
```

**Figure 4:** *Incident Report 26AF02007, p. 8.*

63. After the search turned up nothing, Officer Fraughton kept questioning Mr. Shaw about drug use by people who had ridden in his car, explaining that the questioning was "strictly to see, make sure my dog is doing the right thing."

64. AFPD's records show that the incident ran from approximately 6:40 p.m. until approximately 8:35 p.m. Mr. Shaw was thus detained for well over an hour and close to two hours, after which he was not cited or charged.

65. Chief Paul has acknowledged each of the governing rules the officers ignored: "I can't prolong a stop just for a canine sniff unless I have something more"; "We can't extend the time of a stop beyond what we would normally spend just to be able to deploy a dog"; and, as to the officers' claim that a different person smelled of alcohol, "it wouldn't give articulable suspicion . . . . It's got to be individualized just because someone else has the odor of an alcoholic beverage on their breath [it] doesn't justify it."

66. Chief Paul's attempted defense — that the sniff "was done . . . at the same time they were doing field sobriety tests" — is contradicted by Officer Hawkins' own report, which shows that the dog was summoned only after the tests were finished and Mr. Shaw had blown .000.

67. When shown AFPD's written canine policy, Chief Paul did not dispute that it contains no statement that a stop may not be extended for a canine sniff absent independent reasonable suspicion, responding that "[w]e clearly don't have every single piece of . . . precedent in department policy." He has also defended "scar[ing]" citizens as an accepted AFPD practice: "There are times we will do that where we'll go out and we'll help somebody understand the gravity of the situation and make it appear very serious to them or as serious as it is. And then we will use our discretion and cut them loose."

**E. March 10, 2026 — Officers Sumbot and Somerville detain Ms. Lauts for trying to serve court papers**

68. On March 10, 2026, Ms. Lauts drove her car, with Mr. Schneider as her passenger, to a public street near Mr. Johnson's residence for the sole purpose of serving Mr. Johnson with the summons and complaint in the Oregon action.

69. Ms. Lauts was qualified to serve process: she was over eighteen, a legal resident of the United States, and not a party to the case.

70. Ms. Lauts stayed in her car. She never set foot on Mr. Johnson's property, never went to his door, and never photographed his house. Mr. Johnson reported to dispatch that a woman with "long, fake, red, curly hair" had come near his door and taken pictures and then left on foot "towards the train tracks." Ms. Lauts, whose hair is black with blond streaks, was sitting in her parked car. She waited roughly thirty minutes for Mr. Johnson to come outside so that she could hand him the papers.

71. Mr. Johnson instead called 911. AFPD's own records reflect that when he called, he suggested he might shoot someone. An officer later asked Mr. Johnson on recorded body-worn camera: "One of the dispatchers made a note, saying you were gonna shoot someone?" The officers accepted Mr. Johnson's explanation and took no action regarding the threat.

72. Officers Sumbot and Somerville, among others, arrived, approached Ms. Lauts's car, demanded her identification and address, and questioned her about why she was there and whether she was a "legal" process server. Ms. Lauts answered truthfully and provided her driver's license. She was not free to leave. Officer Somerville stayed posted at the car, explaining: "We just try to have at least one officer to kind of stick around with every group," because "you never know when people are going to try and . . . take off." He was present when the occupants were told that Mr. Johnson "wanted you trespassed."

73. Mr. Johnson told the officers the court papers were fake and that Ms. Lauts was a fake process server, and he asked that she be arrested for "impersonating a process server." Officer Sumbot then called the Marion County Circuit Court, which confirmed that the case was real, that it had been filed, and that Mr. Johnson still needed to be served.

74. Even with the court's confirmation in hand, the officers continued to treat lawful service of process as criminal conduct. Officer Sumbot carried the papers to Mr. Johnson's door but did not deliver them, and Mr. Johnson was allowed to refuse them.

75. The officers then discussed among themselves, on camera, whether to have Ms. Lauts "trespassed" from a property she had never entered: "I'm just gonna see if he wants the girl trespassed." An officer then asked Mr. Johnson, "So what do you want done today, do you want her trespassed?" Mr. Johnson replied: "no, I want them for stalking."

76. Officer Sumbot then told Ms. Lauts that Mr. Johnson "wanted her trespassed from the property and not to return," and Ms. Lauts was formally trespassed even though she remained in her car on a public street the entire time.

77. Mr. Schneider was arrested that day for "stalking" and "targeted residential picketing" on the theory, among others, that people had come to Mr. Johnson's home to serve him. Chief Paul has since conceded that "even between officers, there's some confusion on what can be done? What can't be done? What needs to be done? What should be done?" when it comes to civil process, and that "it's pretty apparent that we need to make sure we're doing some additional training."

### F. March 11, 2026 — Officers seize the GoFundMe sign, seize Mr. Norcross's phone, and arrest him for invoking his right to remain silent

78. On the afternoon of March 11, 2026, Mr. Norcross, Ms. Lauts, and others went to a residential street near Mr. Johnson's home to film a short promotional video for a GoFundMe

fundraiser to help Bryan and his father recover their LEGO collection or its value. Mr. Norcross was the fundraiser’s first donor.

79. With the property owner’s express permission, they hung a sign on a neighbor’s fence. The sign was satirical commentary on a matter of public concern; it depicted a caricature of a man holding cash beside an elderly man in a hospital bed under the caption “‘I stole a dying man’s life savings.’” The plan was to film the sign, with drone footage, for about an hour and then take it down.




**Figure 5:** *A copy of the sign.*

80. Officer Richardson and Lieutenant Adamson arrived. When asked what they were doing, Mr. Norcross explained that they were promoting a GoFundMe for a dying man, and he voluntarily showed Officer Richardson the GoFundMe page on his phone.

INITIAL CONTACT:

I arrived on scene and located a vehicle described by the victim as a black chevy passenger car and could see four individuals attempting to hang a sign from a fence. Officer Richardson and I made contact with the group. There was a white male who was wearing dark colored clothing, glasses (possibly META glasses) with a dark colored beard who began interacting with us. He was identified as Sheldon. Officer Richardson stated it appeared Sheldon was speaking to "Ben" on his phone via FaceTime while attempting to hang the sign.

**Figure 6:** *Lieutenant Adamson’s Supplemental Narrative, Incident Report 26AF02066, p. 14 .*

81. Officer Richardson saw that Mr. Norcross was on a FaceTime call with Mr. Schneider and asked if that was "Ben." Mr. Norcross said yes. Officer Richardson then told Mr. Norcross that he "knew what was going on" and that "Ben was the one organizing all of the people to be here."

82. The officers had the group wait in the car Ms. Lauts had driven while Officer Richardson checked with the neighbors. In Officer Richardson's words: "All the neighbors I had spoken with told me that was okay and it was for a GOFUNDME as far as they knew."

83. Lieutenant Adamson warned the group that they were "slowly becoming a[n] accessory" to stalking and "can be arrested," and told them: "We want Ben and his posse, whatever you guys call yourselves, reckless Ben….." When Officer Richardson reported that the neighbor had confirmed her permission, Adamson's response on camera was: "But does she know what's on there? I doubt it. . . . let me just make sure she knows what's on the signs."

84. Lieutenant Adamson did not accept that answer. He went back to the property owner, asked whether she was aware of the "nature" of the sign, brought her to look at it, and told her that the sign "may be de-constructive and cause problems with her neighbor." Only after Lieutenant Adamson's lobbying did the owner say she no longer wanted the sign. Lieutenant Adamson then personally cut the sign down, and Officer Richardson booked it into evidence as an "artificial intelligence created sign of victim."

85. The officers seized and removed the sign because of its content and viewpoint, and because Plaintiffs were associated with Mr. Schneider, not because of any legitimate time, place, or manner concern.

86. Officer Richardson then went to his patrol car, by his own account, "to look at the Utah Code for Stalking to see if Ben had committed a crime again." He concluded that Mr.

Schneider had committed a crime "because I found Sheldon had been face timing Ben, likely because he was there on Ben's behalf."

87. That FaceTime call was not evidence of a crime.

88. Officer Richardson then ordered Mr. Norcross out of the car. Before any Miranda warning, Lieutenant Adamson laid out the choice: officers "can request a search warrant for your phone, which means we seize your phone," but "if you cooperate with us and you show us and you confirm that you're not involved," Mr. Norcross would "end up with [his] phone." Asked whether officers could look at his phone, Mr. Norcross said no.

89. Officer Richardson then read Mr. Norcross his rights. The BWC footage shows what follows: "Okay, with these rights in mind, uh, do you still wish to talk with me?" "No." "No? Okay. Um, and Lieutenant, Lieutenant Adamson can correct me if I'm wrong. We're going to seize your phone right now."

90. Officer Richardson's report says the same: "He stated he was not willing therefore I felt the best course of action was to seize his phone."

> At this point I returned to my Patrol vehicle to look at the Utah Code for Stalking to see if Ben had committed a crime again. I found that I believed he had committed a crime because I found Sheldon had been face timing Ben, likely because he was there on Ben's behalf. I advised Sheldon of his Miranda Rights for further questioning.
>
> After I advised Sheldon of his Miranda Rights I asked if he was willing to speak with me. He stated he was not willing therefore I felt the best course of action was to seize his phone. Sheldon then immediately opened his phone and began manipulating it which led myself and Lieutenant Adamson to believe he was attempting to destroy evidence on his device.
>
> USE OF FORCE
>
> Because of this action by Sheldon, I quickly grabbed his right arm to attempt to grab the phone. Lieutenant Adamson grabbed Sheldon by the left hand which was the hand that was holding the phone. The phone was forcefully taken from Sheldon after a very brief altercation for it. Sheldon was placed into custody and searched incident to arrest.

**Figure 7:** *Officer Richardson's Supplemental Narrative, Incident Report 26AF02066, p. 8.*

91. Seconds later, officers told Mr. Norcross, "Do not do that. . . . right now you're attempting to destroy evidence. Okay, put your hands behind your back." Mr. Norcross answered:

"I swear, man, I was gonna give you the phone. I was just locking it. That's all I was doing. . . . It was off of my wallet."

92. Lieutenant Adamson wrote that Mr. Norcross "refused to answer questions after being given a Miranda warning and refused to allow officers to review his phone messages," and that he therefore "asked for his phone."

93. Mr. Norcross handed over the phone. His Apple Wallet payment screen was open, so he pressed the side button to lock the screen. Locking a phone's screen does not, and cannot, delete anything from the phone.

94. The officers' two accounts of this moment cannot be reconciled. Officer Richardson wrote that Mr. Norcross "immediately opened his phone and began manipulating it." Lieutenant Adamson wrote that Mr. Norcross had already "handed me his phone" and then "quickly pulled it away and attempted to manipulate it," and that Mr. Norcross "explained he was trying to 'lock the phone.'" Lieutenant Adamson also wrote that, earlier, he "was concerned he was attempting to lock or seal his phone to hinder the investigation."

USE OF FORCE/PRESERVATION OF EVIDENCE:

When Sheldon refused to answer questions and refused to allow officers to go through his phone, because it was possible there was evidence on his phone regarding his involvement with Ben and the victim, I asked for his phone. He handed me his phone and then went I went to grab it, after I had my hand on it, he quickly pulled it away and attempted to manipulate it. I told him to stop and immediately pulled it back explaining that I didn't want him destroying evidence. He complied and explained he was trying to "lock the phone". I told him he was under arrest for potentially destroying evidence. I moved his arm into a cuffing position and Officer Richardson put hand cuffs on him. He was searched and placed into Officer Richardson's police car. It was later discovered he was wearing "META Glasses" and may be recording the interior of the police car or live streaming this interaction. Officer Richardson was made aware of this.

**Figure 8:** *Lieutenant Adamson's Supplemental Narrative, Incident Report 26AF02066, p. 15.*

95. Officer Richardson grabbed Mr. Norcross's right arm and Lieutenant Adamson grabbed his left hand, and "[t]he phone was forcefully taken from Sheldon after a very brief

altercation for it." Lieutenant Adamson then told Mr. Norcross that "he was under arrest for potentially destroying evidence," moved his arm into a cuffing position, and Officer Richardson handcuffed him.

96. The officers had no warrant for the phone, no consent to search it, no probable cause to believe it contained evidence of a crime by anyone, and no exigency. What prompted the seizure were Mr. Norcross's invocation of his right to remain silent and his refusal to let officers read his messages.

97. After seizing the phone, officers manipulated it in an effort to keep it unlocked, against the express wishes of its owner, who had just tried to lock it and asked that it be locked, until the phone eventually locked itself.

98. Chief Paul has conceded that the stated basis for the seizure was invalid: "destroying evidence is different than a locked phone, right? . . . So, if we're destroying evidence, that's very different than someone locking his phone." He added that he had "heard Lieutenant Adamson's explanation. It differs from what's in his report, but what's written in his report would not be a justification for seizing the phone."

99. Mr. Norcross's handcuffs were applied so tightly that both wrists hurt. Eventually, Officer Richardson later loosened them.

100. Officer Richardson then told Mr. Norcross, on camera, "you're under arrest for obstruction of evidence right now," and added: "if you cooperate, I think there's a high probability we cut you a break today. Just food for thought."

101. Officer Richardson also searched Mr. Norcross and, finding nothing, wrote that he "was wearing 'Meta' glasses which record everything. This falls in the theme with Ben and his youtube." Lt Adamson likewise faulted Mr. Norcross because he "may be recording the interior of

the police car or live streaming this interaction." The officers viewed recording and journalism as suspicious activity.

102. Mr. Allen had come to film the scene. When he approached to get a drone shot, Lieutenant Adamson told him to leave, and he did. Mr. Allen later returned, approached Lieutenant Adamson, and asked what was happening with the GoFundMe and who was being arrested. Lieutenant Adamson told him "he needed to leave or I would arrest him for interfering." Mr. Allen, who had broken no law, left as ordered, solely because of that unlawful order.

103. Immediately after Mr. Norcross was arrested, Officer Richardson returned to the car and ordered everyone out, telling them: "I want all of you out. I'm just going to talk with you. I promise none of you go to jail if you don't be stupid like him." "Him" was Mr. Norcross, whose only "offense" was remaining silent and locking his phone. Moments earlier, Officer Richardson had said he would "get them all out and see if they're all . . . accomplice[s]."

104. Under that threat, Ms. Lauts agreed to answer questions. She told Officer Richardson that she was there of her own accord, that she was not being paid, and that Mr. Schneider had not instructed her to be there. Officer Richardson found nothing of note during this conversation and felt these two unidentified individuals did not have malicious intent, and he released them.

105. Officer Richardson transported Mr. Norcross, in handcuffs, to the AFPD station. Although he had been told "you are under arrest," officers at the station called it a "detention." Chief Paul has since acknowledged that "to detain and transport really it does turn into a de facto arrest. There's very limited circumstances where it can remain a detention," and he does not "believe that necessarily applied in our instance."

106. Detective Nicosia questioned Mr. Norcross at the station, repeatedly turning off his own body-worn camera "to review the case and to speak with my supervisor about the case." At one point Detective Nicosia retrieved Mr. Norcross's phone and had Mr. Norcross enter his passcode to demonstrate how the wallet screen worked.

107. Mr. Norcross was held in custody from his arrest at approximately 3:30 p.m. until approximately 8:00 p.m., much of it under interrogation, and then released without charges, and his phone was returned.

**G. March 11, 2026 — Officer Richardson obtains a search warrant for "Lego merchandise" on a false affidavit**

108. After clearing the scene, Officer Richardson learned that a fellow officer's neighbor had "some Youtubers" renting a basement Airbnb at 891 North 150 West in American Fork. Lieutenant Adamson and an officer in an unmarked car surveilled the residence and saw the car associated with Mr. Schneider.

109. Officers contacted the homeowner, who provided exterior video showing Mr. Schneider entering the basement apartment at 3:58 p.m.

110. No AFPD officer recorded the conversation with the homeowner on body-worn camera. Chief Paul has confirmed that every AFPD video of these incidents was released, so that "if something hasn't been released, then it means [it] just does not exist," and that AFPD "just do[es] not have a video of him conversing with the Airbnb homeowner." AFPD policy requires officers to record investigative contacts subject to narrow exceptions, none of which applied.

111. At 5:11 p.m., Officer Richardson — a POST-certified officer of roughly one year's experience — swore out an affidavit for a warrant to search the basement apartment, Mr. Schneider's person, and the Chevy Malibu. The only "property or evidence" the affidavit identified was "Any stolen merchandise, specifically Lego merchandise."

> In the City of American Fork, County of Utah, State of Utah, there is now certain property or evidence described as:
>
> Any stolen merchandise, specifically Lego merchandise.

**Figure 9:** *Affidavit for Search Warrant No. 3352981, p. 1.*

112. To supply probable cause that stolen LEGO merchandise would be found inside, Officer Richardson swore: "The homeowner also disclosed that he could hear multiple individuals inside the residence speaking about possible stolen Lego toys that they had taken. The officer would like to search for said items."

> Officers contacted the homeowner of the Air B&B to inquire about video footage. The homeowner was cooperative and provided video footage that displayed Benjamin walking into the basement apartment at exactly 15:58 hours on this day. The homeowner also disclosed that he could hear multiple individuals inside the residence speaking about possible stolen Lego toys that they had taken. The officer would like to search for said items.

**Figure 10:** *Affidavit for Search Warrant No. 3352981, p. 2.*

113. That statement was false. No one inside the residence discussed "stolen Lego toys that they had taken." Whatever the homeowner may actually have said about LEGO — and there is no recording, because no officer recorded the conversation — the affidavit converted it into what amounted to an overheard confession that the occupants possessed LEGO "that they had taken." No one inside had taken any LEGO toys. The phrase "they had taken" appears in no recording. The statement was either fabricated or recklessly embellished, and Officer Richardson knew, or recklessly disregarded, that it was false.

114. Officer Richardson and Lieutenant Adamson also knew facts that made the statement implausible on its face and that the affidavit omitted: that AFPD had known for days that the dispute concerned a LEGO collection in Oregon that Mr. Schneider was trying to recover through the Oregon courts, not LEGO in Mr. Schneider's possession; that, upon information and

belief, AFPD had never received any report of LEGO stolen in Utah by anyone in the residence; and that the conversation with the homeowner was not recorded.

115. The affidavit contained other false or misleading statements, including that the March 11 sign incident occurred on "March 3rd of 2026"; that Mr. Schneider was "arranging various amounts of individuals to go to the victim's residence and enter his property," when none of the Plaintiffs had entered Mr. Johnson's property; and that the sign was "defaming." It omitted that the owner of the fence had given permission for the sign, that Officer Richardson himself had confirmed that permission, and that Officer Richardson had already concluded that the people with Mr. Norcross had no "malicious intent."

116. The affidavit established no probable cause to believe that any of the occupants other than Mr. Schneider had committed any crime, and it sought no authority to arrest, detain, or search anyone other than Mr. Schneider.

117. A Fourth District magistrate signed the warrant at 5:37 p.m., authorizing a daytime search for "stolen merchandise, specifically Lego merchandise." Without the false LEGO statement, the affidavit would not have supported a search for LEGO merchandise and would not have supported the scope of the search, seizures, and detentions that followed.

118. Chief Paul has admitted the affidavit was a failure: "I will say that the search warrant affidavit presents one of the biggest places where we screwed up." He continued: "This didn't really have anything to do with Legos. We weren't going in to look for Legos. We didn't even search the residence for Legos." And: "in my opinion, we should have never even put Legos in this affidavit."

119. Chief Paul has also admitted that AFPD's written safeguard failed: "a new officer wrote this affidavit. We have a clear directive and policy that search warrant affidavits have to be

reviewed by a supervisor in our department, and in this case . . . [t]his did not get reviewed by a supervisor." He summarized: "Basically what I'm getting at is we failed here."

120. Upon information and belief, Lieutenant Adamson, the supervisor who participated in the investigation, the surveillance, and the homeowner contact upon which the affidavit relied, did not review the affidavit before it was submitted, and did not correct its false statement.

### H. March 11, 2026 — Officers storm the residence with guns drawn including a rifle and handcuff and arrest everyone inside

121. Officer Richardson prepared an operations plan for serving the warrant. By his own account, the plan was "to open the door which was presumed unlocked, and call out any present individuals one at a time, and take them into custody." The plan thus called for taking into custody every person inside, whoever they were, before any officer knew who was there.


OPS PLAN

Since I requested the warrant and was the primary on this case, I created a plan of operation. In this plan I instructed Officer Laycock to run the point position on a tactical stick. He was directly followed by me, then Officer Tonga, Officer Gonzalez, Officer Jensen, and ended with Sgt Lott. Lieutenant Adamson was assigned to perimeter. The plan was to open the door which was presumed unlocked, and call out any present individuals one at a time, and take them into custody.

All units parked their vehicles south of the target location after a briefing had taken place.

CRIMINAL HISTORY

Due to NLETS not working, a criminal history of Benjamin Schneider was not conducted.

WARRANT SERVICE

Officer Laycock led myself and other officers to the basement entrance on the exterior of the residence. Once all officers were set up Officers were immediately in contact with individuals at the doorway. Officers announced "Police Search Warrant". The home was occupied 5 times, including Ben. I held lethal coverage with my Patrol rifle while Officer Tonga began calling people out and placing them in handcuffs. This took place without incident and 5 suspects were taken into custody. These 5 were transported to the American Fork Police Department for further questioning.

**Figure 11:** *Officer Richardson's Supplemental Narrative, Incident Report 26AF02066, p. 11.*

122. Under the plan, Officer Laycock ran "the point position on a tactical stick," followed by Officer Richardson, Officer Tonga, Officer Gonzalez, another officer, and Sergeant

Lott. Lieutenant Adamson was assigned to the perimeter but, as his body-worn camera shows, went to the basement door with the entry team.

123. Inside the basement apartment were Ms. Lauts, Mr. Shaw, Mr. Allen, Mr. Schneider, and a 16-year-old boy. Mr. Shaw had come only to help edit and transfer video. Mr. Allen had returned there after Lieutenant Adamson ordered him away from the sign. Ms. Lauts had returned there after Officer Richardson told her she was free to go.

124. At approximately 5:49 p.m., the entry team stacked up at the basement door with guns drawn. Body-worn camera footage shows the stack at the door at 17:49:10 and an occupant being pulled out with his hands raised two seconds later.




**Figure 12:** *Lt. Adamson BWC, 26AF02066_BWC_Adamson_(1), 17:49:10.*




**Figure 13:** *Lt. Adamson BWC, 26AF02066_BWC_Adamson_(1), 17:49:12.*

125. The officers did not knock. They did not announce their authority and purpose and wait for the occupants to respond. Officer Richardson's report claims that "[o]fficers announced 'Police Search Warrant,'" but no announcement was made and no time was allowed for the occupants to respond before officers were in the doorway ordering them out at gunpoint. They opened the door and entered. Officer Richardson's own body-worn camera records the team's cue — "You ready? On you." — followed immediately by "Everybody step out. Stand up and come outside. Right now. Let's go. Step outside. Step outside, everybody." The footage of the entry itself has been blacked out in the released versions of Officer Richardson's and Officer Laycock's footage.

126. Chief Paul has conceded the point: "even if the door's propped open you, you still announce, right? . . . Just because the door's open does not allow you on a knock-and-announce warrant to just enter the premises. Like, there's no debating that. So, yes, that's an issue I've identified as well."

127. AFPD nonetheless reported to the State, in its Law Enforcement Transparency Incident Entry, that the warrant was a “Knock and Announce Day” warrant, that there was no “Force Entry,” and that “Number of Arrests: 5.” Chief Paul likewise told the public in his May 29, 2026 video that officers entered after knocking and announcing. Those statements are false.

```
Warrant Type:
Knock and Announce Day[Y]
Knock and Announce Night[N]
No Knock Day[N]
No Knock Night[N]
Arrest No Warrant[N]

Judge Approving: Judege Griffin
Threat Assessment Completed Yes[Y] No[]
Force Entry Yes[] No[N]
Evidence Seized Yes[] No[N]
Number of Arrests: 5
Firearm Discharged Yes[] No[N]
Weapon Brandished by Non-LEO Yes[] No[N]
Weapon Used Against Officers Yes[] No[N]
Person or Animal Killed or Injured by LEO Yes[] No[]N
LEO Injured or Killed Yes[] No[N]

Comments:

Search Warrant to apprehend stalking suspect, Benjamin Schneider. Warrant
service took place and 4 individuals were obtain on suspicion of helping
Benjamin Schneider with this crime.
```

**Figure 14:** *Law Enforcement Transparency Incident Entry, Incident Report 26AF02066, p. 13.*

128. Officer Richardson “held lethal coverage with [his] Patrol rifle” — that is, he pointed a rifle at the occupants — while Officer Tonga called them out one at a time and handcuffed them. Other members of the entry team likewise had firearms drawn and directed at the occupants.

129. None of the occupants was armed. None was suspected of a violent crime. AFPD’s own Transparency Entry reports that no one other than officers brandished a weapon. Officer Richardson admitted that “[d]ue to NLETS not working, a criminal history of Benjamin Schneider was not conducted.” There was no information suggesting anyone inside posed a threat.

130. Ms. Lauts, Mr. Shaw, and Mr. Allen complied with every command. Each was nevertheless handcuffed, searched, and held at gunpoint and in handcuffs outside the residence. So was the 16-year-old.

131. The body-worn camera footage shows who did what. Officer Tonga's camera records the words "search warrant" shouted over the same orders to "step out" and "come outside" — not before them — and then: "Okay, we're gonna search you, all of you."

132. Sergeant Lott's and Officer Gonzalez's cameras record the command "Everybody step outside" at the doorway as the occupants were brought out. Lieutenant Adamson, at the door, directed Officer Gonzalez to take custody of a handcuffed occupant: "Gonzalez take this one. Take him over there. Sit down." Sergeant Lott frisked a handcuffed male occupant ("Do you have anything on you . . . ?"), told the group that "some of you may get to jail," collected Ms. Lauts's bag ("this is her bag"), walked Ms. Lauts to a patrol car holding her arm, and buckled her in. Officer Gonzalez handled the occupants' backpacks and placed at least one occupant in a patrol car.

133. Officer Jensen handcuffed Ms. Lauts, searched her pockets, and took her bag. When she told him that "stressful situations kind of make[] my breathing" difficult, he told her, "if you need it I want you to tell me, okay?" — and then she was taken away where there was no one to tell. Officer Jensen then searched Mr. Shaw, took his phone and identification, and removed his backpack, and he transported two handcuffed male occupants to the station, where officers decided to "separate them" into holding cells.

134. Ms. Lauts was handcuffed without being told why. Officers searched her person and searched and took her purse. Officers searched Mr. Shaw and searched and took his backpack. Mr. Allen was searched.

135. Before entering, officers discussed the occupants' cameras. On entry, an officer turned a GoPro camera that was recording on a desk face down, and Lieutenant Adamson grabbed and twisted Mr. Schneider's arm when he attempted to record with his phone and stopped the recording.

136. Officers did not even search the apartment for LEGO merchandise. They spent only a few minutes inside, opened a single closet, and opened no cupboards. The return Officer Richardson swore to the next morning states: "Benjamin Schneider was arrested. No items siezed."

**RETURN TO SEARCH WARRANT**

NO. 3352981

The personal property listed below or set out on the inventory attached hereto was taken from the person of BENJAMIN PAUL SCHNEIDER
DATE OF BIRTH 12/30/1995, by virtue of a search warrant dated the 11th day of March, 2026, and issued by Magistrate ROGER W GRIFFIN of the FOURTH DISTRICT COURT - ALL DEPARTMENT:

Benjamin Schneider was arrested. No items siezed

**Figure 15:** *Return to Search Warrant No. 3352981.*

137. Ms. Lauts relies on an inhaler. When asked if she needed her inhaler, she said, "I may need it, this is a stressful situation, and that makes my breathing not great." An officer replied, "If you need it, I want you to tell me so I can get it for you." She was then placed in a patrol car and a holding cell where she had no one to ask and did not receive her inhaler for nearly two hours.

138. Officer Richardson's report states that the warrant service "took place without incident and 5 suspects were taken into custody," and his Transparency Entry states that "4 individuals were obtain[ed] on suspicion of helping Benjamin Schneider with this crime." No Defendant had probable cause to believe that Ms. Lauts, Mr. Shaw, or Mr. Allen had committed any crime, and none was charged.

### I. Transport, holding cells, interrogation, and release

139. Officers transported the handcuffed plaintiffs to the AFPD station, where they were separated and placed in holding.

140. Detective Nicosia questioned each of them only briefly — roughly fifteen to twenty minutes apiece — after they had been held for hours. He pressed Ms. Lauts to say that the GoFundMe had been Mr. Schneider's idea, to no avail.

141. They were held from ~5:49 p.m. until ~ 8:05 p.m. and then released.

142. Chief Paul has acknowledged that this was unlawful: "[W]e don't have a categorical authority to just put . . . everyone in hand[cuffs] because of the scene of a search warrant"; "that detention mixed with transport . . . in almost every case . . . is going to turn into an arrest"; and "[w]hat these officers would have needed to have, I mean, just speaking frankly, is individualized, probable cause for all five individuals."

143. AFPD's own warrant-service policy, Policy 609, upon information and belief, requires that a person detained during a warrant service "be promptly released" once no probable cause, reasonable suspicion, or safety concern justifies further detention. Defendants did not follow it.

### J. The Chief publicly defends the defendants, then admits their failures

144. On May 29, 2026, AFPD posted a 26-minute video in which Chief Paul presented the department's account of these four incidents to the public. In that video, Chief Paul endorsed and defended the officers' conduct, including the March 9 stop and sniff, the phone seizure, the warrant, and the entry, and represented that officers had knocked and announced. AFPD issued a written news release the same day describing its officers' conduct as "limited to fulfilling our legal obligations and enforcing Utah law."




**Figure 16:** *AFPD YouTube video, "Bricks and Minifigs/Benjamin Schneider Media Release."*

145. In the months that followed, Chief Paul conducted a review of the incidents, including review of the body-worn camera footage. He then told Mr. Sroka: "the honest truth is, we didn't do this perfectly. . . . there's several issues that I think weren't handled well, or were handled outside of policy, and so those are all things that I'm looking to address." He added that "there's things that need to change as a result, and in fact, some of those we've already put into place as far as department training goes," including training on search-and-seizure case law, AFPD's authority to detain and handcuff during search warrants, and the rule that detention plus transport "turn[s] into a de facto arrest."

146. Chief Paul explained: "As a new Dept, we've got our average time on patrol right now is between one and two years." And: "If we had slowed down in a lot of this, we probably would have avoided several of the issues we've discussed."

147. Despite these admissions, no Defendant has been disciplined for the conduct described in this Complaint, so far as Plaintiffs are aware.

148. Chief Paul's earlier statements at the August 10, 2026 meeting with Mayor Frost and Mr. Sroka confirm that the conduct described above reflected AFPD practice rather than

individual error. When asked why every occupant of the Airbnb had been taken into custody, Chief Paul described AFPD's standard practice: "detaining individuals inside of a home that we're serving a search warrant on is almost always the norm because we don't know who they are. . . . So we will almost always [put] somebody [in] custody, [de]tain them, search them, make sure they don't have any weapons on them and then keep them detained while we're executing the search warrant."

149. Chief Paul then insisted that transporting the occupants to the police station did not convert their detention into an arrest — "It does not. It's still a detention" — and acknowledged that AFPD "never proceeded or intended to charge the majority of them except for one and that's why they were released." Five weeks later, after his review, he conceded the opposite: detention plus transport "in almost every case . . . is going to turn into an arrest," requiring "individualized, probable cause for all five individuals."

150. At the same meeting, asked why Mr. Norcross was arrested for locking his phone, Chief Paul said: "we detained him for stalking issues. It wasn't just that he was trying to lock his phone. We have a ton of Supreme Court precedent that allows us to take action when we feel like it's possible that evidence is going to be destroyed. Now I've seen the video, I don't know necessarily what I would have done in that instance." Mr. Norcross was never charged with any offense, and no Defendant had probable cause to believe he had committed one.

151. Chief Paul also acknowledged at the August 10 meeting that his May 29 public video contained at least two misstatements, including his description of the basis for the March 8 stop and a statement that the Oregon suit "had been served," and that he did not know how to correct them. The video remains posted.

152. Chief Paul further explained that the tip about the Airbnb came from the homeowner, who "reached out to an officer at the police department," identified at the meeting as Officer Gonzalez, "who then reached out to Richardson." Officer Gonzalez was then assigned to the entry team for the warrant service at that residence.

153. Mayor Frost, for his part, explained that City elected officials "typically aren't prepped on everything that the police do" and "rely on" the Chief to tell them about questionable incidents, and the Chief confirmed that force incidents are reviewed only by a board "within the police department."

**K. The City's policies, customs, and failures to train, supervise, and discipline**

154. The constitutional violations described above were not isolated. They were caused by the City's policies, customs, and deliberate indifference, including:

a. Failure to train on traffic-stop limits. The City failed to train its officers on what constitutes a stop-sign violation under Utah law, on the requirement of reasonable suspicion particular to the person seized, and on the rule of Rodriguez v. United States, 575 U.S. 348 (2015), that a stop may not be prolonged for a canine sniff absent independent reasonable suspicion. AFPD's canine policy omits that rule entirely. The Chief has acknowledged the need for, and has since begun, training on these subjects.

b. Failure to train on civil process. The City failed to train its officers on service of civil process, so that officers treated lawful process service as stalking and trespass. The Chief has acknowledged that "even between officers, there's some confusion" on the subject and that "additional training" is needed.

c. Failure to train on device seizures. The City failed to train its officers that invoking the right to silence, refusing consent to a phone search, and locking a phone are not crimes and cannot supply probable cause or exigency for a warrantless seizure.

d. Failure to enforce warrant-affidavit review. AFPD has a written policy requiring supervisory review of every search warrant affidavit, and a policy (Policy 608) requiring that search warrant affidavits and operations be submitted to the Chief or his designee. The Chief admits that he does "not review every search [warrant] affidavit that we have" because doing so is "not operationally feasible," and that the affidavit here "did not get reviewed by a supervisor." The City's failure to enforce its own safeguard allowed an officer of one year's experience to obtain a warrant on a false affidavit without any supervisory check.

e. Failure to train on warrant execution. The City failed to train its officers on the knock-and-announce requirement, on the limits of detaining and handcuffing occupants during a warrant service, on the need for individualized probable cause before transporting occupants, and on the prompt release required by Policy 609. The Chief has acknowledged that "that's not a carte blanche thing" and that AFPD is "doing training on [it] to make sure our guys know."

f. Custom of seizing every occupant during warrant service. As Chief Paul described at the August 10, 2026 meeting, AFPD's practice is to take every occupant of a residence into custody, search them, and hold them during a search warrant service "because we don't know who they are," without individualized suspicion, and to treat transport to the station as a mere "detention." Officer Richardson's operations plan here — to "call

out any present individuals one at a time, and take them into custody" — implemented that practice.

g. Custom of muting and switching off body-worn cameras. AFPD officers routinely mute or deactivate body-worn cameras during investigative contacts and fail to reactivate them, without stating a reason on camera. Here, Officer Hawkins muted his camera for the entire sobriety investigation; no officer recorded the homeowner contact on which the warrant affidavit rested; and Detective Nicosia repeatedly turned off his camera during interrogations. The same practice was alleged in Greenland v. Cannon, No. 2:22-cv-00137 (D. Utah), where an AFPD officer turned off his audio while discussing a use of force with then-Sergeant Adamson. The City has adopted no requirement that officers state the reason for muting and has not disciplined officers for the practice.

h. Failure to report and review force. AFPD policy requires a use-of-force report whenever force is used. Upon information and belief, no use-of-force report was submitted for board review for the forcible seizure of Mr. Norcross's phone, the pointing of a rifle at the occupants of the residence, or the handcuffing of the occupants, and Officer Richardson reported the warrant service as having occurred "without incident." Review of force is conducted only by an internal board of AFPD personnel, and City leadership is not informed of incidents unless and until a lawsuit is filed or the Chief chooses to report them.

155. Further, the Chief, as final policymaker, reviewed the officers' conduct, publicly endorsed it in AFPD's May 29, 2026 video and news release, and, so far as Plaintiffs are aware, imposed no discipline on any Defendant. The City thereby ratified the Defendants' conduct and the basis for it.

156. The need for training and supervision on each of these subjects was obvious, and the City's failure to provide it was so likely to result in constitutional violations that the City's policymakers were deliberately indifferent to the rights of persons with whom AFPD officers come into contact. Each of these policies, customs, and failures was a moving force behind the violations of Plaintiffs' rights.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 — Fourth Amendment
### Unreasonable Seizure (March 8, 2026 Traffic Stop)
### (*Tyler Matthew Shaw vs Defendants Richardson and Tonga*)

157. Plaintiffs incorporate by reference all preceding paragraphs.

158. A traffic stop is a seizure of the driver and must be supported, at its inception, by probable cause or reasonable suspicion that the driver has violated a traffic law or is engaged in criminal activity.

159. Officer Richardson stopped Mr. Shaw without probable cause or reasonable suspicion. Mr. Shaw committed no stop-sign violation, as Chief Paul has conceded, and no other traffic violation or crime.

160. Officers Richardson and Tonga then extended the seizure to investigate matters unrelated to any traffic mission, without independent reasonable suspicion particular to Mr. Shaw.

161. No reasonable officer could have believed that stopping a driver for a traffic violation that did not occur, and holding him for an unrelated investigation, was lawful. The right was clearly established.

162. As a direct and proximate result, Mr. Shaw suffered damages.

**COUNT II**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unlawful Stop and Unlawful Prolongation of Stop (March 9, 2026)**
**(*Tyler Matthew Shaw vs Defendants Hawkins, Fraughton, and Bibeau*.)**

163. Plaintiffs incorporate by reference all preceding paragraphs.

164. Officer Hawkins stopped Mr. Shaw without reasonable suspicion that Mr. Shaw had committed a traffic violation or any crime. A person who had just left a property when asked to do so walking toward a car does not supply reasonable suspicion as to the car's driver.

165. Officers Hawkins and Fraughton then prolonged the stop by fabricating signs of impairment ("glossy" and "red"-tinted eyes) that they knew did not exist, and by conducting field sobriety tests without reasonable suspicion of impairment.

166. After Mr. Shaw passed the eye test and blew .000 on a portable breath test, any conceivable suspicion was dispelled. Defendants nevertheless continued to hold Mr. Shaw "by the curb" so that Officer Fraughton could conduct a canine sniff, in violation of Rodriguez v. United States, 575 U.S. 348 (2015).

167. Officer Hawkins' stated purpose — "I was gonna scare him a little bit and let him go" — and his stated aim of building "harassment charges" against Mr. Schneider are not lawful bases for seizing Mr. Shaw. By his own account recorded on his in-car camera, he did not see anything "clear as day" indicating Mr. Shaw was impaired before he prolonged the stop.

168. Officer Hawkins initiated the stop, conducted the sobriety investigation, ordered Mr. Shaw to wait by the curb after he blew .000, and summoned the dog. Officer Fraughton vouched for the false "glossy" eyes claim, deployed the dog, and joined in the search. Officer Bibeau held Mr. Shaw at the curb while the dog was deployed and the car was searched. Each also failed to intervene in the others' conduct despite a realistic opportunity to do so.

169. The seizure lasted roughly two hours and violated Mr. Shaw's clearly established Fourth Amendment rights.

170. As a direct and proximate result, Mr. Shaw suffered damages.

**COUNT III**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unlawful Search of Vehicle (March 9, 2026)**
**(*Tyler Matthew Shaw vs Defendants Hawkins and Fraughton*)**

171. Plaintiffs incorporate by reference all preceding paragraphs.

172. Defendants searched Mr. Shaw's car without a warrant, without valid consent, and without probable cause.

173. The claimed canine alert was false, and Defendants knew it was false. Even if a sniff occurred, it was the fruit of an unlawfully prolonged detention and could not supply probable cause.

174. Any acquiescence by Mr. Shaw was not voluntary consent. It followed Officer Hawkins' announcement that the vehicle "is going to be searched," and it was obtained during and by exploitation of an unlawful detention.

175. The search violated Mr. Shaw's clearly established Fourth Amendment rights. As a direct and proximate result, Mr. Shaw suffered damages.

**COUNT IV**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unreasonable Seizure (March 10, 2026)**
**(*Sierra Nicole Lauts vs Defendants Sumbot and Somerville*)**

176. Plaintiffs incorporate by reference all preceding paragraphs.

177. Defendants seized Ms. Lauts by approaching her parked car with multiple officers, demanding her identification and address, and holding her while they investigated, such that no reasonable person would have felt free to leave.

178. Defendants had no reasonable suspicion that Ms. Lauts had committed or was committing any crime. Sitting in a car on a public street, waiting to serve court papers, is lawful.

179. Defendants continued the detention even after the issuing court confirmed that the case and papers were genuine and that Mr. Johnson still needed to be served, and they then purported to "trespass" her from property she had never entered.

180. The seizure violated Ms. Lauts's clearly established Fourth Amendment rights. As a direct and proximate result, Ms. Lauts suffered damages.

**COUNT V**
**42 U.S.C. § 1983 — First Amendment**
**Retaliation and Interference with Petitioning Activity (March 10, 2026)**
**(*Sierra Nicole Lauts vs Defendant Sumbot*)**

181. Plaintiffs incorporate by reference all preceding paragraphs.

182. Service of process is an integral part of petitioning the courts for redress, which the First Amendment protects. Ms. Lauts was engaged in that protected activity when she sought to serve the Oregon court papers.

183. Defendants responded by detaining Ms. Lauts, questioning her legitimacy as a process server, entertaining Mr. Johnson's demands that she be arrested for "stalking" and "impersonating a process server," and formally notifying her of trespass from property she had never entered.

184. Those actions would chill a person of ordinary firmness from continuing to serve process, and they were substantially motivated by Ms. Lauts's protected activity.

185. As a direct and proximate result, Ms. Lauts suffered damages.

**COUNT VI**
**42 U.S.C. § 1983 — First Amendment**
**Content-Based Suppression of Speech (March 11, 2026 Sign)**
**(*Sheldon David Norcross and Sierra Nicole Lauts vs Defendants Adamson and Richardson*.)**

186. Plaintiffs incorporate by reference all preceding paragraphs.

187. The sign was political and satirical speech on a matter of public concern, displayed on private property with the owner's permission to promote a lawful fundraiser.

188. After the owner confirmed her permission to Officer Richardson, Lieutenant Adamson lobbied her to withdraw it because of the sign's message, then cut the sign down himself, and Officer Richardson seized it as "evidence."

189. Defendants acted because of the sign's content and viewpoint and because of Plaintiffs' association with Mr. Schneider. Their conduct served no compelling or significant governmental interest and was not narrowly tailored.

190. Defendants' conduct violated Plaintiffs' clearly established First Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT VII**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unreasonable Seizure of Property (March 11, 2026 Sign)**
**(*Sheldon David Norcross and Sierra Nicole Lauts vs Defendants Adamson and Richardson*.)**

191. Plaintiffs incorporate by reference all preceding paragraphs.

192. Plaintiffs had a possessory interest in the sign they were displaying.

193. Defendants seized the sign without a warrant, without probable cause to believe it was contraband or evidence of a crime, and without exigency. Expressive material does not become evidence of "stalking" because officers dislike its message.

194. The seizure violated Plaintiffs' clearly established Fourth Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT VIII**
**42 U.S.C. § 1983 — Fourth Amendment**
**Warrantless Seizure and Manipulation of Cell Phone (March 11, 2026)**
**(*Sheldon David Norcross vs Defendants Richardson and Adamson*.)**

195. Plaintiffs incorporate by reference all preceding paragraphs.

196. A cell phone is an effect protected by the Fourth Amendment, and officers generally must obtain a warrant before searching it. Riley v. California, 573 U.S. 373 (2014).

197. Defendants forcibly seized Mr. Norcross's phone without a warrant, without consent, and without probable cause to believe it contained evidence of a crime. By Officer Richardson's own account, he decided to seize the phone because Mr. Norcross invoked his right to remain silent. By Lieutenant Adamson's own account, he asked for the phone because Mr. Norcross refused to answer questions and refused to let officers read his messages.

198. Invoking the right to remain silent and refusing consent to a search cannot supply probable cause, reasonable suspicion, or exigency. Locking a phone's screen destroys no evidence, as Chief Paul has conceded.

199. After the seizure, officers manipulated the phone to keep it from locking, further interfering with Mr. Norcross's possessory and privacy interests without a warrant.

200. Defendants' conduct violated Mr. Norcross's clearly established Fourth Amendment rights. As a direct and proximate result, he suffered damages.

**COUNT IX**
**42 U.S.C. § 1983 — Fourth Amendment**
**Arrest Without Probable Cause and Unlawful Detention (Sheldon Norcross)**
**(*Sheldon Norcross vs Defendants Richardson, Adamson, and Nicosia*.)**

201. Plaintiffs incorporate by reference all preceding paragraphs.

202. Defendants Richardson and Adamson arrested Mr. Norcross, handcuffed him, and transported him to the police station for "obstruction of evidence" without probable cause to believe he had committed any crime.

203. Locking one's own phone after an officer demands it, without any warrant, is not obstruction or tampering with evidence, and no reasonable officer could have believed otherwise.

204. Detective Nicosia continued Mr. Norcross's custody for hours at the station without probable cause, after it was or should have been apparent that no crime had been committed.

205. Defendants handcuffed him so tightly that both of his wrists hurt.

206. Defendants' conduct violated Mr. Norcross's clearly established Fourth Amendment rights. As a direct and proximate result, he suffered damages.

**COUNT X**
**42 U.S.C. § 1983 — First Amendment**
**Retaliation (Sheldon Norcross)**
**(*Sheldon David Norcross vs Defendants Richardson and Adamson*.)**

207. Plaintiffs incorporate by reference all preceding paragraphs.

208. Mr. Norcross engaged in protected activity: displaying a sign on a matter of public concern, promoting a fundraiser, associating with a journalist, recording and newsgathering, and declining to speak with police.

209. Defendants seized his phone, handcuffed and arrested him, and caused him to be held for hours. Those actions would chill a person of ordinary firmness.

210. Defendants' actions were substantially motivated by Mr. Norcross's protected activity, as evidenced by Officer Richardson's own statement that he seized the phone "therefore" — because Mr. Norcross would not speak with him — the officers' disparagement of Mr. Norcross's recording glasses as falling "in the theme with Ben and his youtube," and Officer

Richardson's use of Mr. Norcross as an example of what happens to people who are "stupid like him."

211. As a direct and proximate result, Mr. Norcross suffered damages.

**COUNT XI**
**42 U.S.C. § 1983 — First Amendment**
**Retaliation and Threat of Arrest (Steven Allen)**
**(*Steven Allen vs Defendant Adamson*.)**

212. Plaintiffs incorporate by reference all preceding paragraphs.

213. Mr. Allen engaged in protected activity by filming police activity in a public place and asking an officer what was happening and who was being arrested.

214. Lieutenant Adamson threatened to arrest Mr. Allen for "interfering" if he did not leave, and noted in his report that Mr. Allen "may have been attempting to glean information on the investigation." Mr. Allen was not interfering with anything.

215. A threat of arrest for asking questions and recording would chill a person of ordinary firmness, and it was motivated by Mr. Allen's protected activity. Hours later, Mr. Allen was handcuffed at gunpoint and arrested.

216. As a direct and proximate result, Mr. Allen suffered damages.

**COUNT XII**
**42 U.S.C. § 1983 — Fourth Amendment**
**Judicial Deception — False and Misleading Warrant Affidavit**
**(*Sierra Nicole Lauts, Tyler Matthew Shaw, and Steven Allen vs Defendants Richardson and Adamson*.)**

217. Plaintiffs incorporate by reference all preceding paragraphs.

218. Officer Richardson knowingly and intentionally, or with reckless disregard for the truth, included in his affidavit the false statement that the homeowner "could hear multiple individuals inside the residence speaking about possible stolen Lego toys that they had taken," together with the other false and misleading statements and omissions described above.

219. Upon information and belief, Lt Adamson supplied, approved, or failed as the responsible supervisor to correct the information concerning the homeowner contact, knowing the affidavit would be used to obtain a warrant.

220. With the false statements removed and the omitted facts included, the affidavit would not have established probable cause to search the residence for stolen LEGO merchandise, and it would not have supported the scope of the entry, searches, and seizures that followed. Chief Paul has admitted that the warrant "didn't really have anything to do with Legos."

221. Defendants' conduct violated Plaintiffs' clearly established Fourth Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XIII**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unreasonable Manner of Entry — Failure to Knock and Announce**
**(*Sierra Nicole Lauts, Tyler Matthew Shaw, and Steven Allen vs Defendants Richardson, Laycock, Tonga, Gonzalez, Jensen, Lott, and Adamson*.)**

222. Plaintiffs incorporate by reference all preceding paragraphs.

223. Plaintiffs were lawful overnight guests in the basement apartment and had a reasonable expectation of privacy there.

224. Before entering a dwelling to execute a warrant, officers must knock, announce their identity and purpose, and allow a reasonable time for the occupants to respond, absent exigent circumstances.

225. The warrant was not a no-knock warrant, and no exigency existed. Defendants nevertheless opened the door and entered without knocking, announcing, or waiting, as Chief Paul has conceded "there's no debating."

226. Each Defendant personally participated: Officer Richardson planned the entry and was second through the door with his rifle; Officer Laycock led the team to and through the door

on point; Officer Tonga, third in the stack, called the occupants out; Officers Gonzalez and Jensen and Sergeant Lott were at the doorway as the occupants were ordered out; and Lieutenant Adamson was at the door directing officers. Sergeant Lott and Lieutenant Adamson, the supervisors present, did nothing to require a knock and announcement.

227. Defendants' conduct violated Plaintiffs' clearly established Fourth Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XIV**
**42 U.S.C. § 1983 — Fourth Amendment**
**Excessive Force — Firearms Pointed at Compliant, Unarmed Occupants**
**(*Sierra Lauts, Tyler Shaw, and Steven Allen vs Defendants Richardson, Tonga, Laycock, Gonzalez, Jensen, Lott, and Adamson*.)**

228. Plaintiffs incorporate by reference all preceding paragraphs.

229. Pointing a firearm at a person who poses no threat, is not suspected of a violent crime, and is complying with commands is excessive force.

230. Officer Richardson held "lethal coverage" on Plaintiffs with his patrol rifle, while Plaintiffs were unarmed, compliant, and not suspected of any crime, during the police raid for a misdemeanor suspect and for LEGO merchandise.

231. These Defendants also had guns drawn and saw a rifle trained on unarmed, compliant occupants for the duration of the call-out, and had a realistic opportunity to intervene, but did not.

232. These defendants either directly participated in this excessive force or as an alternative had the opportunity and ability to intervene but chose not to.

233. The force used was objectively unreasonable. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XV**
**42 U.S.C. § 1983 — Fourth Amendment**
**Arrest and Detention Without Probable Cause (March 11, 2026 Raid)**
**(*Sierra Lauts, Tyler Shaw, and Steven Allen vs Defendants Richardson, Adamson, Tonga, Gonzalez, Jensen, Lott, and Nicosia*.)**

234. Plaintiffs incorporate by reference all preceding paragraphs.

235. A search warrant for premises carries a limited authority to detain occupants during the search; it does not authorize arresting them, transporting them to a police station, or holding them for hours. Taking someone from the scene to the station for questioning is an arrest that requires probable cause.

236. Defendants planned in advance to "take . . . into custody" every person inside, and they did: they handcuffed Plaintiffs, transported them to the station, placed them in holding cells, and held them for more than two hours. AFPD reported five "arrests."

237. Defendants had no probable cause to believe that Ms. Lauts, Mr. Shaw, or Mr. Allen had committed any crime. Officer Richardson had concluded that very afternoon that Ms. Lauts had no "malicious intent," and Mr. Shaw and Mr. Allen had done nothing more than edit and film video.

238. Each Defendant personally participated.

239. Detective Nicosia continued Plaintiffs' custody without probable cause, in violation of AFPD Policy 609, until he released them without charges.

240. Defendants' conduct violated Plaintiffs' clearly established Fourth Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XVI**
**42 U.S.C. § 1983 — Fourth Amendment**
**Unlawful Searches of Persons and Property (March 11, 2026)**
**(*Sierra Lauts, Tyler Shaw, and Steven Allen vs Defendants Tonga, Jensen, Lott, and Gonzalez.*)**

241. Plaintiffs incorporate by reference all preceding paragraphs.

242. The warrant did not authorize a search of any person other than Mr. Schneider. A warrant to search premises does not authorize the search of every person found there.

243. Officer Tonga announced "we're gonna search you, all of you," and searched the occupants he handcuffed; Officer Jensen searched Ms. Lauts and her bag and searched Mr. Shaw, taking his phone, identification, and backpack; Sergeant Lott frisked a handcuffed male occupant and took Ms. Lauts's bag; and Officer Gonzalez took and handled the occupants' backpacks and property.

244. Defendants searched Ms. Lauts's person and her purse, Mr. Shaw's person and backpack, and Mr. Allen's person, and seized Ms. Lauts's purse and Mr. Shaw's backpack, without a warrant, without probable cause, and without consent, as part of a pretextual operation in which Defendants never genuinely searched for the LEGO merchandise the warrant described.

245. Defendants' conduct violated Plaintiffs' clearly established Fourth Amendment rights. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XVII**
**42 U.S.C. § 1983 — First Amendment**
**Retaliation (All Plaintiffs)**
**(*All Plaintiffs vs Defendants Hawkins, Fraughton, Richardson, Adamson, and Sumbot.*)**

246. Plaintiffs incorporate by reference all preceding paragraphs.

247. Each Plaintiff engaged in protected activity: newsgathering and recording; serving process on behalf of a litigant; displaying a sign and raising money on a matter of public concern; associating with a journalist; and declining to speak with police.

248. Defendants subjected Plaintiffs to a four-day campaign of stops, detentions, searches, threats, arrests, an armed entry, and custodial interrogation that would chill a person of ordinary firmness from continuing those activities.

249. Defendants' conduct was substantially motivated by Plaintiffs' protected activity, as shown by, among other things, the absence of any lawful basis for the actions taken; the officers' repeated efforts to get Plaintiffs to say they were acting at Mr. Schneider's direction; Officer Hawkins' stated plan to "scare him a little bit"; Officer Richardson's search of the Utah Code "to see if Ben had committed a crime again"; the seizure of the sign because of its message; and the officers' treatment of recording and YouTube journalism as inherently suspect.

250. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XVIII**
**42 U.S.C. § 1983 — Supervisory Liability**
**(*Sheldon David Norcross, Sierra Nicole Lauts, Tyler Matthew Shaw, and Steven Allen vs Defendants Adamson and Lott*.)**

251. Plaintiffs incorporate by reference all preceding paragraphs.

252. Lieutenant Adamson and Sergeant Lott were supervisors who personally participated in, directed, and approved the conduct described above on March 11, 2026, including the phone seizure and arrest of Mr. Norcross (Adamson), the investigation on which the warrant affidavit rested and the submission of that affidavit without the supervisory review AFPD policy requires (Adamson), and the entry, armed seizure, handcuffing, and transport of every occupant of the residence (Adamson and Lott).

253. Each acted with deliberate indifference to, and knowledge of, the constitutional violations being committed by the officers under his supervision, and caused those violations.

254. As a direct and proximate result, Plaintiffs suffered damages.

**COUNT XIX**
**42 U.S.C. § 1983 — Municipal Liability (Monell)**
**By All Plaintiffs, against Defendant City of American Fork.**

255. Plaintiffs incorporate by reference all preceding paragraphs.

256. The violations of Plaintiffs' constitutional rights described above were caused by the City's official policies, widespread customs and practices, decisions of its final policymaker, and deliberately indifferent failures to train, supervise, and discipline, as described herein.

257. Among other things, the City:

(a) failed to train its officers on the constitutional limits governing traffic stops, the prolongation of stops for canine sniffs, warrantless phone seizures, service of civil process, warrant affidavits, knock-and-announce, and the detention and transport of occupants during warrant service;

(b) failed to enforce its own policy requiring supervisory review of search warrant affidavits;

(c) maintained a custom of muting and deactivating body-worn cameras during investigative contacts;

(d) failed to require reporting and review of force;

(e) staffed its patrol division with officers averaging only one to two years of experience without adequate supervision; and

(f) through its Chief, publicly endorsed and ratified the conduct at issue.

258. The need for training and supervision on these subjects was obvious, and the City had notice of deficiencies through prior incidents and litigation. The City's failures reflect deliberate indifference to the constitutional rights of persons with whom AFPD officers come into contact.

259. The City's policies, customs, and failures were the moving force behind each of the constitutional violations alleged herein.

260. As a direct and proximate result, Plaintiffs suffered the injuries and damages described above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, and award:

a. Compensatory damages in an amount to be determined at trial;

b. Punitive damages against each individual Defendant in an amount to be determined at trial;

d. Reasonable attorney fees and costs under 42 U.S.C. § 1988;

e. Pre- and post-judgment interest as allowed by law; and

f. Such other relief as the Court deems just.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 14th day of October, 2026.

**SPENCER FANE LLP**

*/s/ Scott Young*
Scott Young

* Solomon M. Radner (**pro hac* pending)
**RADNER LAW GROUP, PLLC**
17515 W. 9 Mile Rd. Ste. 1050
Southfield, MI 48075
Tel: (877)-723-6375 * Fax: (866) 571-1020
solomon@radnerlawgroup.com

*Attorneys for Plaintiffs*